UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

19-CR-60200-MORENO

UNITED STATES OF AMERICA

    Plaintiff,

v.

ALI AHMED,

    Defendant.

_____/

**AHMED'S SENTENCING MEMORANDUM
AND REQUEST FOR A VARIANCE**

We submit this memorandum on behalf of Ali Ahmed to urge the Court to impose a sentence below the guideline range of 108 – 135 months that was jointly recommended in the plea agreement so that this caring and hard-working man can have a chance at redemption. Mr. Ahmed intends to make a personal plea to the Court at sentencing evidencing his regret, remorse and acceptance of responsibility for the charged conduct.

We propose a sentence by variance that will accomplish through incarceration the harsh punishment that society seeks, but that does not amount to the kind of crushing sentence that so many judges, scholars, and even the President of the United States, feel are excessive and profoundly unjust. A sentence for Mr. Ahmed of 60 months incarceration followed by three years of supervised release would represent a harsh sentence given the facts of the case and Mr. Ahmed's personal history.

Ali Ahmed is a 39 year-old businessman and new father who immigrated to this country from Pakistan by way of Saudi Arabia in 1990. He was educated here and ultimately became a citizen of the United States in 2003. During high school, at Western in Davie, Fl., Mr. Ahmed excelled in academics as well as sports. He graduated two years early at the age of 16 while also playing football, baseball, and running track.

Mr. Ahmed's life has not been without difficulty following his graduation from high school as a young teen. He failed to graduate from college and has battled depression and significant drug abuse for years since. All the while, however, Mr. Ahmed has remained a loving brother and son to his family, and a caring and helpful source of support for the patients who were under his care. He now looks forward to life after his sentence where he hopes to excel in his new role as a father. Mr. Ahmed's first child, Asher, will celebrate his first birthday just three days after Mr. Ahmed goes into custody on this case.

Mr. Ahmed has touched those around him with a blend of compassion and care that is highlighted in the letters submitted to the Court on Mr. Ahmed's behalf.[1] His co-workers sing his praises and echo the refrain that Mr. Ahmed is a deeply caring and helpful man. His family loves him and knows he can be rehabilitated. A common thread among the comments made by those who have lent their support is Mr. Ahmed's generosity with his time and his dedication to being a source of positivity.

We propose that the Court impose a sentence of 60 months followed by three years of supervised release, below the bottom of the guideline range from the plea agreement, and indeed, for the reasons we outline below, a sentence well below the Government's recommendation of the

---

[1] DE 154.

statutory maximum, which would be the most appropriate sentence given Mr. Ahmed's background and the evidence in this case. Such a sentence would be sufficient, but not greater than necessary to vindicate the sentencing imperatives of 18 U.S.C. § 3553(a).[2]

## PROCEDURAL BACKGROUND

Ali Ahmed comes before the Court for sentencing after accepting a plea agreement offered by the Government where he was convicted of a single count of conspiracy to commit healthcare fraud and wire fraud, in violation of 21 U.S.C. § 1343. While the statute of Mr. Ahmed's conviction authorizes a maximum sentence of 240 months, even half that time would be inappropriate in this case. The Government and Mr. Ahmed jointly recommended a score of 31 points with a guideline range of 108 to 135 months, in the written plea agreement, which was the only plea extended to Mr. Ahmed in this case. The Government would not negotiate any of the proposed terms or adjustments.

The Government now recommends a guideline range of 188 – 235 months, essentially arguing for the statutory maximum sentence because of what the Government argues is obstruction of justice committed by Mr. Ahmed relating to his disclosure of a passport. Such a sentence would be unfair, inappropriate, excessive and would not serve the interests of justice as Mr. Ahmed did not hide the passport's existence.[3] To consider such a sentence because of an obstruction of justice allegation that never happened would be a miscarriage of justice.

The advisory Guideline range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary."[4] Ali Ahmed asks the Court for a sentence of 60

---

[2] *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).
[3] DE 145.
[4] *See Id.* (*quoting* § 3553(a)).

3

months followed by three years of supervised release, below the bottom of the guideline range recommended in the plea agreement, which would be the most appropriate sentence given Mr. Ahmed's background, the facts in this case and his acceptance of responsibility. Mr. Ahmed submits the following sentencing memorandum to assist the Court in determining an appropriate sentence pursuant to 18 U.S.C. § 3553(a).

## RELEVANT FACTUAL BACKGROUND

### A. PERSONAL HISTORY

Mr. Ahmed immigrated to the United States from Pakistan by way of Saudi Arabia in 1990 at the age of 9. He was not accompanied by his parents on the trip. He came to this country alone and lived with his aunt and uncle. His parents and the rest of his family joined him a few years later. He and his four siblings were raised by hard working parents who brought them to the United States in search of a better life. Mr. Ahmed's father, Altaf, was an engineer before he retired. His mother, Shahida, was a retired pediatrician who still volunteers in the healthcare field every week. Mr. Ahmed's parents are both still married and alive today at 73 years old, but Mr. Ahmed's father suffers from diabetes and his mother is a breast cancer survivor with severe arthritis.

Mr. Ahmed started college as a 16-year old, attending Nova Southeastern University after skipping two grades in middle school and graduating high school early. It was around this time that Mr. Ahmed first began experimenting with alcohol with the other students, most of whom were older. While some 16 year-old students might have been well equipped for the rigours and social difficulties inherent in the first year of college, Mr. Ahmed was not. He did not perform well, ultimately faltering and ending his studies after two years. Mr. Ahmed did try again to go back to school five years later, in 2005, taking classes at the University of Miami and Broward Community College, but again, he failed to graduate.

Mr. Ahmed battled severe depression for years. It manifested after Mr. Ahmed failed to complete college despite graduating high school early and becoming accustomed to excelling in school. His acohol abuse, which started as a young teen when he entered college at too young an age, graduated to harder drugs once Mr. Ahmed first stopped attending college. Between the years 2000 and 2005, depressed and no longer taking classes, Mr. Ahmed became addicted to harder drugs, abusing them on a daily basis. What started as a young teen experimenting with alcohol and marijuana as a college student became a daily battle with cocaine and heroine use, among other drugs. By the time Mr. Ahmed tried to go back to school in 2005, he didn't stand a chance. Addicted to serious narcotics and five years removed from his last time in school, Mr. Ahmed took a few classes here and there before again ultimately puttering out and giving up.

While secretly battling his demons under the surface, Mr. Ahmed outwardly remained a source of pride and mentorship to his younger sister, **Nazish Ahmed**, who spoke of the role model her brother played in her life starting with when she first moved to the United States. Mr. Ahmed, who had come a few years before his sister, was waiting for her with a grin she says she'll never forget. He would not let his failures in school or life, which he kept secret from his family, negatively affect his sister, making sure she learned that she could achieve more than he ever did. Nazish Ahmed wrote of her brother that, "he reminded me that my stature was only calculated in my education, and while he never finished his undergraduate degree, he worked to make sure I got the assistance to get into the best school possible, get the scholarships and the support to get through it." Nazish Ahmed went on to graduate from law school and is now a chief assistant public defender in Georgia.

Mr. Ahmed became a father this past year with the birth of his first son, Asher. Mr. Ahmed fell in love with the mother of his child, Ashlyn Little, while she was a patient at his treatment

center, Serenity. Mr. Ahmed knew this love was forbidden, but he could not resist his feelings. Once Ms. Little left Serenity, she and Mr. Ahmed became romantically involved, ultimately getting engaged. Asher, their son who is now 11 months old, is the apple of his father's eye. Many of the letters of support submitted to the Court echo this fatherly pride. Mr. Ahmed wanted to start a family with Ms. Little, but she left him after his arrest in this case and sought full custody of their son, though custody remains shared between the two. Mr. Ahmed could not be more thankful for the time he's been able to spend with his son. He feels lucky to have witnessed his son's first steps before he goes into custody to begin serving his sentence.

Mr. Ahmed's focus in his life has shifted entirely to his son and having an opportunity to watch Asher grow after he gets out of prison. Nowhere is Mr. Ahmed's love for his young son better exemplified than in the letter to the Court written by **Beverly Gaffney Moraga**, a newborn/pediatric nurse who helped Mr. Ahmed care for his newborn son when Asher finally came home from the hospital. Ms. Little lost custody of Asher due to drug use shortly after he was born, and when Asher came home from the hospital, Ms. Little had to leave the home. Mr. Ahmed was left to take care of his newborn son alone. Ms. Little was not allowed to be around Asher but for supervised visits, so Mr. Ahmed hired Mrs. Gaffney Moraga to help. He was in over his head trying to do it alone.

Mrs. Gaffney Moraga was a huge help with Mr. Ahmed's newborn son when he first came home from the hospital, and she became a necessary fixture in the home. Mr. Ahmed came to rely on Mrs. Gaffney Moraga who writes that "Al made sure Asher was cared for by professionals and had everything he needed. He is an excellent father, Asher is his first baby, so he wanted to learn everything." In her time working for Mr. Ahmed, Mrs. Gaffney Moraga observed that he "spent

all his spare time with his son" and that "he loves him wholeheartedly." Mr. Ahmed looks forward to the opportunity to serve his time so he can return to being with his son.

**B.  COMMUNITY AND BUSINESS HISTORY**

By 2016, Mr. Ahmed entered the healthcare industry by managing the clinics he ran with his brother. It started as a genuine interest in helping people cope with the addictions that plagued Mr. Ahmed for much of his life. Mr. Ahmed thought he could make a positive change in the patients' lives and offer a service that would work because he'd been in their shoes before. And despite the instances of fraud for which Mr. Ahmed accepts responsibility, Mr. Ahmed did help his patients at the facility however he could. He had a positive impact on the patients at Serenity, many of whom experienced compassion from Mr. Ahmed and received whatever valuable guidance and advice on their road to recovery that he could offer.

**Darla Mantz**, a paralegal at Jones Day who's son, Adam, sought treatment at Mr. Ahmed's facility wrote a letter to the Court where she talks about how helpful Mr. Ahmed was to her son. Mrs. Mantz wrote that "Adam has been in treatment at a few different facilities of the last 3-4 years and none of them compared to Serenity Ranch as it relates to parental involvement, compassion for Adam and a true concern for his well-being and recovery. Ali always tried to help Adam see his future in a positive light and gave him hope for a much better life." Mrs. Mantz believes that Mr. Ahmed is a genuinely compassionate person and noticed positive changes in her son after his time with Mr. Ahmed.

Mr. Ahmed was known at the facility as someone the patients and employees could count on for positive support. He took his job seriously, believing as a former addict that he had a special knowledge to make a difference in managing such a treatment center. Mr. Ahmed's motivations

were not lost on those who worked closely with him, like **Kay Stevens**, a nurse practitioner at Serenity. Mrs. Stevens wrote a letter to the Court where she spoke of Mr. Ahmed's "good soul." Of Mr. Ahmed, Kay Stevens wrote that "he has a heart of gold and would do anything to help anyone- patient or employee. He always went above and beyond to make sure his patients and employees were taken care of in the best way possible, without judgement or questions. It is part of who he is; a good soul. He treated patients and employees with utmost respect on a consistent, daily basis."

**Elizabeth Lachendro**, another co-worker who wrote a letter to the Court, noted that Mr. Ahmed would always come to work early, was always eager to help and was always busy while at work. In speaking of Mr. Ahmed's work ethic and respectful nature, Ms. Lachendro remarked that "he truly has a kind heart. From small things where if he went out to get himself a coffee or a snack he would ask other staff if they want something to always being there for the clients. In fact the clients were always struggling to go see him as he would assist with anything they asked for: examples would be asking to change rooms in their housing or asking for staff to transport them to an appointment. He would contact appropriate staff immediately to help the clients. The list of things that Al did to help the clients and staff is endless. Also he would listen when clients just came to talk and presented with a solid understanding of the difficulties inherent in the disease of addiction." Ms. Lachendro echoes what Kay Stevens wrote, that Mr. Ahmed would do anything to help the patients or the staff. There was actual good being done at Serenity, and Mr. Ahmed took pride in what he was able to accomplish. The fraudulent claims for reimbursement at issue do not and should not alone define Mr. Ahmed.

One particular patient from Serenity on whom Mr. Ahmed's caring approach had a profound impact, **Caprice Hunt-McIntee**, credits Mr. Ahmed with his successful road to recovery

and for being clean for four years. Mr Hunt-McIntee writes that Mr. Ahmed's impact on him was "nothing but positive," saying, "I cannot speak to anything that is outlined in these proscribed indictments but what I can speak to is Ali Ahmed's character, compassion and generosity in our time of need. My spouse at the time had some severe health concerns in addition to a series of pending legal concerns and Al went above and beyond to offer his support and expertise to make sure we both recovered in a way that was as effective as possible. Up until then I had been through two different treatment centers before coming to his facility and ***today can proudly say that I am four years clean and sober unequivocally because of Al's compassion and empathy***." Mr. Ahmed's positive impact in the lives of others has been extraordinary and has contributed to the physical and emotional well-being of many people along the way.

## NO EVIDENCE OF OBSTURCTIVE CONDUCT

The base offense level proposed by the Government as it relates to a two-level enhancement for obstruction of justice and a denial of a three-level reduction for acceptance of responsibility is entirely unsupported by the evidence. Mr. Ahmed was clear with the Magistrate Judge at his first appearance that he'd lost his passport,[5] disclosed the only international trip he'd taken with the passport[6] and surrendered the passport id card that had been issued with the passport booklet that had since been lost.[7] Mr. Ahmed hid the existence of the lost passport from no one, and it is unjust for the Government to request a maximum sentence based on what is verifiably false.

---

[5] DE 145.
[6] PSI at ¶ 51.
[7] PSI at ¶ 11.

The Court should entirely reject the Government's obstruction of justice argument. The Government relies on false positions. Additionally, their focus is on behavior that were it to have been true in the first place would not have been sufficiently material to necessitate denial of Mr. Ahmed's three-level reduction for acceptance, and certainly not a two-level increase for obstruction. There was no obstruction.

The Court must ensure that the Government carries this burden by presenting reliable and specific evidence.[8] We recognize that the Government's burden at sentencing is a preponderance standard.[9] And while this burden may not be the kind of heavy burden imposed by a reasonable doubt standard, it does require the Government to put forth evidence. As the *Lawrence* Court noted:

> Although not as rigorous as the reasonable doubt or clear and convincing standards, the preponderance standard is not toothless. It is the district court's duty to ensure that the Government carries this burden by presenting reliable and specific evidence. As one of our sister circuits noted: [T]he Guidelines do not reduce district court judges to mere automatons, passive compilers of ciphers, or credulous naifs who must accept as canon all that which is presented to them regarding a defendant's involvement in the crime charged or conduct relevant thereto.... [T]he preponderance of the evidence standard ... does not relieve the sentencing court of the duty of exercising the critical fact-finding function that has always been inherent in the sentencing process.... [The standard signifies] a recognition of the fact that if the probation officer and the prosecutor believe that the circumstances of the offense, the defendant's role in the offense, or other pertinent aggravating circumstances, merit a lengthier sentence, they must be prepared to establish that pertinent information by evidence adequate to satisfy the judicial skepticism aroused by the lengthier sentence that the proffered information would require the district court to impose.[10]

The Court must make specific findings concerning the evidence of obstruction to follow the Government's recommendation in this case. Accordingly, the Government falls well short of

---

[8] *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir.1995).
[9] *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005).
[10] *Lawrence*, 47 F.3d 1559, 1566–67 (11th Cir. 1995).

meeting this burden because there is no evidence that Mr. Ahmed tried to hide the existence of the lost passport.

By virtue of the Government's proposed guideline calculation – a calculation premised in large part on the baseless allegation that Mr. Ahmed obstructed justice – Mr. Ahmed's proposed guideline range is astronomical: 188 – 235 months. Notwithstanding this incorrect application of the guidelines, and whatever this Court decides the guidelines are, it is well established that a sentencing court "may not presume that the Guideline range is reasonable," but rather "must make an individualized assessment based on the facts presented."[11] The *Gall* Court specifically rejected the use of rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified.[12] The Court also rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range.[13]

Accordingly, after calculating the proper offense level under the Guidelines and giving the Government and defendant the opportunity to argue for the sentence they believe to be appropriate, the district judge must consider each of the § 3553(a) factors and "tailor the sentence" to fit the circumstances of the case.[14] The import of *Booker* is that "sentencing judges have broad discretion to impose a non-guideline sentence by weighing the factors under § 3553(a)."[15] In doing so, the Court must fashion the least restrictive sentence that vindicates the sentencing imperatives of 18 U.S.C. § 3553(a)(2).[16] 18 U.S.C. § 3553(a) provides:

---

[11] *Gall v. United States*, 552 U.S. 38, 50 (2007).
[12] *Id.* at 47.
[13] *Id.*
[14] *United States v. Booker*, 543 U.S. 220, 245 (2005).
[15] *United States v. Robertson*, 662 F.3d 871, 875 (7th Cir. 2011).
[16] *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

> (a) The court shall impose a sentence **sufficient, but not greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
>> (1) the nature of the circumstances of the offense and the history and characteristics of the defendant;
>>
>> (2) the need for the sentence imposed—
>>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>> (B) to afford adequate deterrence to criminal conduct;
>>> (C) to protect the public from further crimes of the defendant; and
>>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>>
>> (3) the kinds of sentences available;
>>
>> (4) the kinds of sentence and the sentencing range established for—
>>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>>
>> (5) any pertinent policy statements—
>>> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code . . . .
>>
>> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
>>
>> (7) the need to provide restitution to any victims of the offense.

Application of the § 3553(a) factors allows a sentencing court "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[17]

---

[17] *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted).

As applied to this case, these factors urge a sentence of no more than 60 months followed by three years of supervised release, which would be "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced."[18]

## GROUNDS FOR VARIANCE – THE 3553(a) FACTORS

### (a)(2)(A) Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A sentence of 60 months followed by three years of supervised release is life-altering "just" punishment that will account for the seriousness of the offense and promote respect for the law. The Court in *Prosperi*[19] approved of the lower court's reasoning that there is inherent punishment to a person who is forced into the criminal justice system for the first time:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.[20]

The stress, fear and shame of being a defendant in a criminal case have had a deep psychological impact on Mr. Ahmed. For the rest of his life, he will carry the social stigmata of being a convicted felon. Morever, Mr. Ahmed's conduct and conviction will have a permanent emotional and psychological consequence for his young son. The appropriateness of the proposed sentence is supported by Mr. Ahmed's acceptance of responsibility for his misconduct, as he will express

---

[18] *Kimbrough*, 552 U.S. at 111.
[19] *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012).
[20] *Id.* at 48.

13

personally to the Court at the time of sentencing. He will express his sincere desire to make amends for his bad behavior.

(a)(2)(B) Need for Sentence to Afford Adequate Deterrence

Research studies show that the severity of punishment does not have as much of a deterrent effect on crime as the certainty of being apprehended and punished. Valerie Wright, Ph.D., an analyst for The Sentencing Project, a national non-profit organization engaged in research and advocacy on criminal justice policy issues and sentencing reform, published the following findings:[21]

- Research to date generally indicates that increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits.[22]

- The Institute of Criminology at Cambridge University was commissioned by the British Home Office to conduct a review of research on major studies of deterrence. Their 1999 report concluded that '. . . studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.'[23]

- Daniel Nagin and Greg Pogarsky, leading scholars on deterrence, conclude that 'punishment certainty is far more consistently found to deter crime than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences.'[24]

Wright's observations are not just the province of advocacy groups. The Department of Justice's own National Institute of Justice echoed these findings in a July 2014 publication.[25] The National Institute of Justice sets forth the following:

---

[21] Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT (Nov. 2010), available at http://www.sentencingproject.org/doc/deterrence%20briefing%20.pdf.
[22] *Id.* at 1.
[23] *Id.* at 4.
[24] *Id.*
[25] *See* National Institute of Justice, *Five Things About Deterrence* (July 2014) (*citing* Daniel

14

- The *certainty* of being caught is a vastly more powerful deterrent than the punishment. Research shows clearly: If criminals think there's only a slim chance they will be caught, the severity of punishment—even draconian punishment—is an ineffective deterrent to crime.[26]

- Sending an offender to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime.[27]

- Police deter crime by increasing perception that criminals will be caught and punished.[28]

- Increasing the severity of punishment does little to deter crime. Laws and policies designed to deter crime are ineffective partly because criminals know little about the sanctions for specific crimes.[29]

Finally, as Judge Rakoff observed in *Adelson*, "there is [] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."[30] A sentence of 60 months followed by three years of supervised release will significantly punish Mr. Ahmed.

(a)(3) Kinds of Sentences Available

The offense of conviction does not carry a mandatory sentence. The Sentencing Guidelines are advisory, and a guideline sentence is not presumptively reasonable. This Court has wide discretion to impose a sentence that is reasonable. Toward that end, we propose a sentence that includes a period of incarceration that satisfies the goals of punishment, retribution and deterrence, but stops short of crushing a defendant who can resume a productive life.

---

Nagin, *Deterrence in the 21st Century*, CRIME AND JUSTICE IN AMERICA: 1975-2025 (ed. Michael Tonry, University of Chicago Press, 2013)).
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd* 301 Fed. App'x 92 (2d Cir. 2008).

### (a)(6) Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct

Although cooperation may be a permissible basis on which a disparity between sentences can exist, the disparity here, were the Court to sentence Mr. Ahmed to a lengthy prison sentence, would be extraordinary compared to the sentences the cooperating co-defendants will receive for participation in the very same conspiracy. Mr. Ahmed wanted terribly to cooperate and provide substantial assistance to the Government, making every effort to sit down with the FBI to discuss issues specifically addressed in previous meetings between counsel for the defendant and the Government. The Government, however, would not allow Mr. Ahmed to assist on any other matters without first cooperating against his brother on this case. Because Mr. Ahmed could not bring himself to testify against his brother, he was denied any such opportunity to cooperate and assist on other matters.

## MR. AHMED'S HISTORY AND CHARACTERISTICS

Mr. Ahmed's history and characteristics are admirable. He is a kind, caring, and giving man. There is perhaps no more appropriate a time for Mr. Ahmed's compassion to be considered than on the day this Court decides his fate. As Judge Rakoff of New York's Southern District has so eloquently said:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed court to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."[31]

---

[31] *Adelson*, 441 F. Supp. 2d 506, 513-14.

As the Court considers what constitutes a reasonable sentence pursuant to § 3553(a), it should keep in mind the Supreme Court's admonition that "the punishment should fit the offender and not merely the crime."[32] The Supreme Court observed in *Koon* that "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[33]

Mr. Ahmed is paying dearly and will continue to do so for the rest of his life. He respectfully asks the Court to consider all the facts and information detailed in this memorandum. Mr. Ahmed's mission to help those suffering from addiction, with a dedication to helping misguided patients, provides a valid basis for a downward variance in Mr. Ahmed's case.

A sentence of 60 months followed by three years of supervised release, and indeed, a sentence significantly less than 108 months serves as the least restrictive sentence necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Mr. Ahmed. Here, the significant mitigating factors relating to Mr. Ahmed's personal, professional, and community background provide compelling support and justification for the proposed sentence.

---

[32] *Pepper*, 131 S.Ct. at 1240 (internal quotations omitted).
[33] *Koon v. United States*, 518 U.S. 81, 113 (1996).

## **CONCLUSION**

Mr. Ahmed urges the Court to impose a sentence not to exceed 60 months incarceration followed by 3 years of supervised release.

Respectfully submitted,

**THE HORENSTEIN FIRM, P.A.**
40 NW 3rd St.
PH1
Miami, Florida 33128
Telephone (786) 444-2723

By:   /s Bradley Horenstein

**BRADLEY HORENSTEIN, ESQ.**
brad@thehorensteinfirm.com
Florida Bar No. 0096000
*Counsel for Ali Ahmed*

**CERTIFICATE OF SERVICE**

   We certify that on January 15, 2020, my office electronically filed this pleading with the Clerk of the Court using the Court's CM/ECF system.

                By: <u>/s Bradley Horenstein</u>
                    **BRADLEY HORENSTEIN, ESQ.**
                    *Counsel for Ali Ahmed*