**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-60200-CR-MORENO**

**UNITED STATES OF AMERICA**

**v.**

**ALI AHMED,**

**Defendant.**
_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**

The United States, by and through the undersigned Assistant United States Attorneys, hereby files its response in opposition to the motion for variance filed by defendant Ali (a/k/a "Al") Ahmed. In support of its response, the United States avers as follows:

DEFENDANT'S CONDUCT DOES NOT WARRANT A DOWNWARD VARIANCE.

1. *Ahmed's Personal Circumstances Do Not Qualify As an "Extraordinary Case"*.

Defendant Ali Ahmed should not be awarded a downward variance or departure from the applicable sentencing guideline calculation. For the reasons set forth below, this Court should reject any request for a downward variance and impose a term of imprisonment within the applicable advisory guideline level.

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 330, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), courts review a defendant's sentence for reasonableness. *See United States v. Winingear*, 422 F.3d 1241, 1245 (11th Cir. 2005). After *Booker*, a district court,

1

in determining a reasonable sentence, must correctly calculate the advisory guidelines range and then consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005); *Winingear*, 422 F.3d at 1246. The factors set forth in § 3553(a) serve as a guide in this review. *Id*. at 1246. Those factors include: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (4) the need to protect the public; and (5) the guideline range. *See* 18 U.S.C. § 3553(a).

Post *Booker* precedents emphasize that district courts must correctly calculate the advisory guideline range before granting a variance, *see United States v. Crawford*, 407 F.3d 1174, 1178 1179 (11th Cir. 2005), and that traditional guidelines departures are still an integral part of the sentencing process post *Booker*, *see United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005). Under this framework, defendant terms his request for a sentence less than the guideline sentence pursuant to § 3553(a) as a variance rather than a departure. *See United States v. Scott*, 426 F.3d 1324 (11th Cir. 2005) (distinguishing between departures from the guideline range and variances pursuant to the § 3553(a) factors). A variance is a sentence outside the applicable advisory guideline range that is imposed after such range, including any departures, has been correctly calculated. *See United States v. Irizarry*, 458 F.3d 1208, 1211 12 (11th Cir. 2006).

A district court may only depart or vary from the Sentencing Guidelines when there is an "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. §

3553(b). When making this determination, the court may "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Id*.

In view of these sentencing principles, a sentence within the applicable sentencing guidelines range, taking into account defendant's offense conduct, her personal history and circumstances, just punishment, and adequate deterrence, is reasonable. As the *Booker* Court noted, "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Booker*, 125 S.Ct. at 767. A sentence within the Guidelines range would satisfy one of the explicit § 3553(a) factors. *See* 18 U.S.C. § 3553(a)(4).

Defendant relies on several grounds for a downward departure or variance, namely his "personal, professional, and community background." *Defendant's Sentencing Memorandum* at 17. In response, Ahmed's personal circumstances are not so extraordinary as to remove his case from the heartland warranting a downward departure. Rather, they militate in favor of the imposition of an enhanced rather than lenient sentence.

Ahmed's request for variance rests in large part upon his devotion to his son, Asher. Defendant admittedly met and seduced the mother of his son, Ashlyn Little, while she was a patient at Serenity Treatment Center. Ms. Little, then 28 years old, was a long-term heroin addict who sought drug treatment at defendant's drug rehabilitation center in the fall of 2017. Shortly after her arrival at Serenity, defendant began a sexual relationship with Ms. Little which eventually resulted in her pregnancy. Ahmed moved Ms. Little to a hotel and provided her with heroin and other drugs while she was pregnant with his child. *See* PSI at ¶ 86; *Text Messages between Ali Ahmed and Ashlyn Little*, Exhibit A. During this period, defendant purchased life insurance

3

policies in the name of Ms. Little without her knowledge. Upon Asher's birth, both mother and child tested positive for heroin, cocaine, and benzodiazepines (PSI at ¶ 86).

Ahmed attests to his model conduct with respect to his son. Defendant's actual comportment toward Asher in his young life differs sharply with the representations made in his motion. Ms. Little enjoyed full custody of Asher from his birth on January 24, 2019, until March 5, 2019, when the infant was placed in shelter pursuant to a Verified Petition for Dependency in Broward County filed by the Department of Children and Families (PSI at ¶ 86). Ahmed assumed custody of Asher that same day until Ms. Little regained custody on July 22, 2019 (*id.*).

On September 23, 2019, Ms. Little filed a petition for sole parental responsibility (PSI at ¶ 87). The petition stated that it is in the best interest of Asher that parental responsibility be awarded solely to Ms. Little and that shared parental responsibility would be detrimental to the child because Ahmed had assisted in providing drugs to her while she was pregnant (*id.*). Ms. Little additionally cited defendant's financial interests in Canada, his statements about leaving the United States because of his pending criminal cases, and his emotional abuse of her as grounds for sole custody (*id.*). On January 7, 2020, the court limited defendant's visitation rights to visiting Asher at his day care center. *See In Re the Interest of Asher Little, Order on Judicial Review/Permanency Review*, Exhibit B, ¶ 26 at p. 19.

As can plainly be seen, the rationalization to reduce Ahmed's sentence to reunite defendant and son is strained under these facts and circumstances.

Consequently, defendant's circumstances do not qualify as an "extraordinary case" which would constitute deviation from the advisory guideline. Rather, Ahmed's case is ordinary and is within the "heartland" of typical cases covered by the applicable guideline. *See Koon v. United*

4

*States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (noting that a departure from the Sentencing Guidelines is only appropriate if the case is outside the "heartland" of typical cases embodied by the guideline); *see also, e.g.*, *United States v. Panfil*, 338 F.3d 1299 (11th Cir. 2003); *United States v. Miranda*, 348 F.3d 1322 (11th Cir. 2003).

    2.   *Defendant Engaged In Obstructive Conduct.*

Defendant maintains that he did not engage in obstructive conduct warranting application of USSG § 3C1.1. As set forth in the government's response to the objections to the Presentence Investigation Report ("PSI") (DE 143), defendant failed to inform the U.S. Probation Office during his pretrial services interview of the existence of his second valid passport. Nor did he reveal the existence of this passport to the U.S. Probation Officer in preparation of the PSI in this case. Those facts remain undisputed.

With regard to defendant's candor before the U.S. Magistrate Judge at the time of his initial appearance, it bears noting that defendant lied about his drug usage. During the court hearing, the PTS officer reported to the court that defendant only "reported prior usage over 15 years ago." *See Transcript of Pretrial Detention Hearing*, Exhibit C (DE 41 at 18). This confirms the information Ahmed conveyed to Pretrial Services that he last used marijuana and cocaine fifteen years ago. *See Pretrial Services Report* at 4.

This statement made to the court is patently false if defendant's more recent representations to the U.S. Probation Office are to be believed. Defendant, age 38, reported to the U.S. Probation Officer who prepared the PSI report in this case that he first used marijuana at age 16 and continued to smoke one "joint" twice per week, until age 25 (PSI at ¶ 100). Ahmed reported his first use of cocaine at age 18, with last reported use at age 30 (*id.*). He said he snorted one gram of cocaine

5

daily from his mid-20s until age 27, when he stopped all use, until his relapse at age 30 (*id.*). Defendant further disclosed that he first used methamphetamines at age 24, with his last reported use being at age 30 (*id.*). He added that he smoked or snorted $100 worth of methamphetamine weekly until age 27, when he quit all substance use, and again at age 30, during his six-month relapse (*id.*). In addition, defendant admitted that he used Percocet and Oxycodone, starting at age 24, which he quit using at age 25, when he started using heroin (*id.*). Ahmed advised U.S. Probation that he injected $100 worth of heroin weekly, until age 27, and again during his 6-month relapse at age 30 (*id.*). Defendant also used Xanax, starting at age 30, for a period of six months, and took ecstasy from age 21 until age 24 (*id.*). Lastly, defendant disclosed to probation that he used LSD and mushrooms, one time, in his mid-20s (*id.*).

Taken together, it is clear that Ahmed attempted to manipulate the court at his detention hearing to avoid drug testing while on bond. It is without cavil that providing inaccurate information to the magistrate judge impeded justice. This together with his dissembling concerning his "lost" second passport warrants denial of his acceptance of responsibility and the imposition of a two-point upward adjustment for obstruction.

   3.   *Defendant Enriched Himself By Exploiting Vulnerable Young Drug Addicts.*

As demonstrated above, Ahmed has failed to establish grounds that would warrant a downward variance. To the contrary, defendant's stance seeking leniency consciously overlooks the real casualties of his actions: the grave harm he caused the victims of this offense, that is, the vulnerable addicts that were afforded little or no care at Serenity Rehabilitation Center while defendant and his brother Sebastian reaped millions of illicit proceeds from their parents' insurance coverage in this case. A two-level increase applies "[i]f the defendant knew or should have known

6

that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).  A "vulnerable victim" is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, comment (n.2).  Both a victim's circumstances and immutable characteristics can render a victim "vulnerable."  *United States v. Bradley*, 644 F.3d 1213, 1288 (11th Cir. 2011).

The Serenity Treatment Center patients were young people sorely in need of legitimate substance abuse treatment that defendant offered but failed to provide.  They were largely 18 to 25 years old, far apart from family and friends; borderline homeless, addicted to drugs, and prone to manipulation.  Ahmed directly participated in the patients' recruitment and facilitated their continued drug abuse in order to capitalize on insurance proceeds.  Because he is liable for his own actions as well as the foreseeable actions of his coconspirators, USSG § 1B1.3(a)(1), and because he targeted people whose age and "mental condition" made them "susceptible to the criminal conduct," § 3A1.1, cmt. n. 2, the Court would be well within its authority to apply this enhancement.  And regardless of whether it applies, it is incumbent upon the Court to send a strong, clear message that such a violation of the patients' trust cannot and will not be tolerated.

   *4. The 3553(a) Factors Strongly Weigh Against Granting Any Downward Variance.*

In light of the extenuating nature of defendant's corrupt actions, a reduced sentence, as advocated by defense counsel, would absolve defendant of his egregious conduct and provide little deterrent to like-minded offenders.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment cries out for a

7

sentence commensurate with that advised by the Sentencing Guidelines. These factors are unquestionably legitimate, and, serve as a reasonable basis upon which to not vary downward from the advisory guideline range.

By any metric, defendant's criminal conduct was serious. It caused serious financial loss: an actual loss in excess of six million dollars, with an intended loss of tens of millions more. It was serious in duration, spanning multiple years. It was serious in scope, as it involved a network of multiple companies, patients flown in from across the country, and a high volume of false and fraudulent claims submitted to multiple national insurance companies. It was serious in terms of the role that defendant personally played in the scheme, given that he was a co-owner and co-creator of these businesses; that he proactively recruited and managed others in the scheme; and that he profited more than anyone aside from his co-defendant and brother, Sebastian Ahmed.

And perhaps most of all, it was serious because, day in day out, greed drove defendant to engage in exploitation of a vulnerable population – members of society grappling with potentially fatal drug addiction issues. Patient medical files and search warrant evidence, as well as witness statements, revealed that the patients repeatedly tested positive for illicit substances; that Al Ahmed would personally overrule medical judgments of doctors or other professionals and make intake or discharge decisions, as well as decisions on medication regimens; and that instead of helping to put the patients in detox or higher levels of care to address repeated drug use, or finding employees with appropriate backgrounds to treat the patients, defendant reportedly supplied the patients with vapes, created a socially destabilizing environment at the sober home houses, and even supplied the patients with drugs so that relapsing patients could continue to be billed. One patient even described how Al Ahmed facilitated payment for her abortion so that she would stay

at the facility, as pregnant patients could not continue on with the purported treatment. While defendant now claims the Court should exercise leniency because of his own addiction issues, such issues make Ahmed's choice to have exploited other addicts all the more egregious, as he of all people should have understood that he was gambling with their lives.

Any sentence must promote respect for the law as well as accomplish the goals of specific and general deterrence. These factors likewise counsel that substantial punishment is warranted on the facts of this case. Sober homes fraud schemes have, unfortunately, taken root in this community as well as in other enclaves across the country, and a message must be sent to other would-be offenders that the criminal justice system strongly condemns transporting young, "dope sick" patients across state lines to South Florida, for the purposes of profiting off of exorbitantly expensive, medically unnecessary urine testing and false claims for therapy sessions that never occurred. Through these schemes, laws that were put in place to address the heroin and opioid crisis – namely, the Affordable Care Act – which made substance abuse treatment affordable and available to virtually everyone – were, instead, turned into a treasure trove for unscrupulous sober home owners, treatment facility providers, and labs, including Ahmed and his co-defendants.

Indeed, the Eleventh Circuit has explicitly emphasized the significance of "general deterrence . . . in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308-09 (11th Cir. 2014); *see also, e.g.*, *United States v. Kuhlman*, 711 F.3d 1321, 1328–29 (11th Cir. 2013) (vacating, as substantively unreasonable, sentence of time served, which represented a 57-month downward variance, for defendant responsible for $3 million health care fraud scheme, noting that "[s]uch a sentence fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence," and that "[w]e are hard-pressed

9

to see how a non-custodial sentence serves the goal of general deterrence."), *cert. denied*, 134 S. Ct. 140, 187 L. Ed. 2d 38 (2013). Here, such a deterrent message is all the more warranted given the breadth of Ahmed's criminal activity while operating Jacob's Well, Medi MD, and Arnica; and given that the crimes were far more pernicious than most insurance fraud schemes, in terms of its callous disregard for the value of patients' lives.

Nor is it notably mitigating that Ahmed lacks significant criminal history. Estimates suggest that more than seventy percent of fraud offenders, which includes the vast majority of white collar offenders, have little or no criminal history. *See* Selected Sentencing, Guideline Application, and Demographic Information for § 2B1.1 Offenders, Fiscal Year 2012, U.S. SENT'G COMM'N (Sept. 18, 2013). This suggests a particular need to deter those in the community who lead superficially law-abiding lives, but, like Al Ahmed, commit fraud for years, before getting caught. Moreover, courts have also found that, in the context of white collar crime, positive employment history is no mitigating factor, particularly where, as here, the employment history enabled and/or served as the vehicle for the offenses of conviction (Al Ahmed used his ties to the marketing/leads community to identify and recruit patients and other conspirators). *See, e.g.*, *United States v. Whitehead*, 559 F.3d 918, 921 (9th Cir. 2009) (Gould, K., dissenting from denial of rehearing *en banc*) ("We can hardly be surprised if a white collar criminal has a good employment history – otherwise, he or she would likely not be in a position to commit the crime.").

In this case, Al Ahmed's background suggests not only a need to accomplish general deterrence, but also a need for specific deterrence. Though it is his first federal criminal offense, this conduct was not his first foray into fraud or reckless financial activity. In 2011, he was civilly sued due to breach of trust and theft from his former employer, Kaplan (PSI at ¶ 131). That case

10

arose from defendant's choice to steal and sell leads containing information about prospective students [1] almost immediately after his involuntary termination from Kaplan in 2010 (*id.*). Defendant later voluntarily filed for Chapter 13 bankruptcy on December 30, 2013, and the civil suit was stayed and administratively closed due to the bankruptcy (*id.*). In 2014, Kaplan filed a complaint for money judgment and determination of debt, *see* 14-01608-JKO, which resulted in a final judgment of $15,119,847.50 against defendant on October 22, 2014 (PSI at ¶ 132). After initially failing to file the required asset disclosures, Ahmed's debt was ultimately discharged through the bankruptcy in late 2015 (PSI at ¶ 130) – yet, it did not relieve him of the $15 million judgment owed (*see* PSI at ¶¶ 131-132). Against this backdrop, instead of changing his tune or taking steps to pay the $15 million judgment imposed, he proceeded to engage in more aggressive, reckless, fraudulent, and manipulative "marketing" practices. Moreover, defendant received much of his share of the proceeds from the instant crime in the form of transfers from his brother and/or kickbacks from corrupt laboratories, which were deposited into numerous shell companies and then withdrawn in cash. A logical explanation as to why he may have had a motive to, to some degree, keep his name off of some of the accounts – and the insurance claims paperwork – would be because of his prior bankruptcy and desire to avoid having to pay monies owed. And,

---

[1] As explained in footnote 1 to the PSI (PSI ¶ 131 n.1):

> Kaplan invests significant time, financial resources, and expertise in developing information about prospective students who might be interested in enrolling in Kaplan programs. These "student leads" are developed directly by Kaplan and through purchases from lead aggregators. The secrecy and confidentiality of student leads is maintained by storing the information in the "lead database," which is maintained on specific, segregated, and secure servers, with limited access through a password-protected software system.

11

as set forth in paragraph 133 of the Presentence Investigation Report, defendant also indicated that he has not filed taxes since 2015.

Finally, the need to avoid unwarranted sentencing disparities between similarly situated offenders supports denial of a variance. Kenny Chatman, another former owner of a sober homes network in South Florida, received a sentence of 330 months' imprisonment after pleading guilty. *See* 17-cr-80013-DMM (DE 217). The guidelines range in that case was 168 to 210 months (level 33). *See* 17-cr-80013-DMM (DE 274, Sentencing Tr., at 14, 61). While Chatman, unlike Al Ahmed, had criminal priors and committed his offense while on supervised release, this Court should nonetheless consider that the Court varied upward in the Chatman case based on aggravating factors that are also present in this case. Thus, while the Government is not seeking an upward variance, a sentence of 60 months' imprisonment, as requested by defendant, would be severely out of sync with an appropriate sentence for his conduct. Other addicts' recovery have been obstructed by Ahmed and his conspirators' selfishness, and, like Chatman, Ahmed abused his position of power to sexually – not just financially – exploit the patients.

In sum, the record reveals nothing to indicate that the range of sentence prescribed under the Sentencing Guidelines is unreasonable in light of the § 3553(a) factors, and defendant's request for a below guidelines sentence should be rejected.

## **CONCLUSION**

WHEREFORE, based on the foregoing, the United States respectfully requests that the Court consider the position of the United States with respect to the request for a downward variance filed by defendant Ali Ahmed in the instant case.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:  /s/ Christopher J. Clark
CHRISTOPHER J. CLARK
Assistant United States Attorney
Florida Bar No. 0588040
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9167
christopher.clark@usdoj.gov

LISA H. MILLER
Court ID No. A5502054
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9312
Lisa.Miller@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                                          /s/ Christopher J. Clark
                                          CHRISTOPHER J. CLARK
                                          ASST. UNITED STATES ATTORNEY